IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MONTRICIA PITTMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:06-cv-0507-WKW |
| ) | |
| D.T. MARSHALL, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on the defendant's Motion to Dismiss Second Amended Complaint. (Doc. # 26.) Montricia Pittman ("Pittman"), a former correctional officer with the Montgomery County Sheriff's Department, brings claims of gender discrimination and retaliation as described in her September 29, 2005 Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and a claim of retaliation as described in her second EEOC charge of April 20, 2006, against Sheriff D.T. Marshall. For the reasons set forth below, the defendant's motion to dismiss is due to be granted.

**I. FACTS AND PROCEDURAL HISTORY**

This dispute began with two incidents between Pittman and an inmate. The first incident occurred on June 27, 2005, when Pittman sprayed the inmate with mace, opened his cell door, and ordered him out of his cell in response to his verbally abusing her and throwing urine on her. (Second Am. Compl. ¶ 15.) A little over a month later, on July 30, 2005, the second incident occurred when "the same inmate again verbally abused her." (*Id.* ¶ 17.)

Pittman was subsequently accused of violating departmental policy for improperly opening the inmate's cell door and ordered to report to training. (*Id.* ¶ 18.)

In a letter[1] dated August 5, 2005, Pittman complained that male officers had not been disciplined for more serious infractions and requested that her training be rescheduled because of a conflict. (*Id.* ¶ 21.) It appears that she ultimately failed to attend the training. She was then charged with three violations by the department: (1) "[d]erelict in duty because of her alleged unprofessional responses to the inmate's actions and provocations;" (2) "[i]nsubordinate to her supervisor by refusing to report for the training arranged by the supervisor;" and (3) "[f]ailure to comply with verbal orders given to [sic] for training at a specified time." (*Id.* ¶ 22.) An investigation ensued, and upon its completion on September 12, 2005, Pittman was immediately terminated for the alleged violations. (*Id.* ¶ 23.) Pittman filed her first EEOC Charge of Discrimination on September 29, 2005 (Doc. # 1-2), and claimed gender discrimination and retaliation resulting from these events. The EEOC issued a Right to Sue letter on March 7, 2006. (Doc. # 1-2.)

Meanwhile, Pittman appealed her termination to the county personnel department. On January 3, 2006, the personnel department reinstated her without backpay on the condition that she complete the "Inmate/Officer Relations Training" within ten days. (Second Am. Compl. ¶ 24.) After her reinstatement, Pittman claims she was accused[2] of

---

[1] The complaint does not specify to whom the letter was addressed.

[2] The complaint does not specify who accused Pittman of harassment.

harassing an Officer Stallworth, who she suggests was unwillingly subpoenaed to testify at a personnel hearing.[3] (*Id.* ¶ 33.) Later in the day, Pittman was approached by a Lt. Jackson, who questioned her about her conversation with Stallworth. (*Id.* ¶ 35.) Pittman claims that a few days later, Lt. Jackson called an Officer Motley, asked him to write a statement against her for harassment, and informed him that if he did not do so he would be brought up on charges. (*Id.* ¶ 36-37.)

On January 25, 2006, Pittman alleges that after she was ordered to report to his office between 4:30 a.m. and 6:30 a.m., Lt. Jackson was not there when she arrived at 4:30 a.m. (*Id.* ¶ 38.) Later in the day, Pittman was able to contact Lt. Jackson, and he allegedly verbally harassed her about her conduct and gave her a letter of warning not to participate in any activities on the job that were not work-related. (*Id.* ¶ 39.) Finally, two days later she called the defendant, Sheriff Marshall, and requested a meeting with him regarding Lt. Jackson's letter. (*Id.* ¶ 40.) Sheriff Marshall responded that he did not have time to meet with her. (*Id.*) According to Pittman, the "confusion and accusations by her superiors" led her to become "extremely stressed" and resulted in a lack of "composure at all times," thereby placing her in an "unsafe position with inmates." (*Id.* ¶ 41.) As a result of her work environment, Pittman became depressed and discouraged, and upon the advice of her psychologist, she resigned in February 2006. (*Id.* ¶ 42.)

Due to the alleged incidents occurring between her reinstatement and her subsequent

---

[3] It is assumed the personnel hearing referred to is Pittman's, although the pleadings do not make this clear.

resignation, Pittman filed a second EEOC Charge of Discrimination on April 28, 2006 (Doc. # 7-2), claiming retaliation for her first EEOC charge. On January 9, 2007, the EEOC issued another Right to Sue letter. (Doc. # 11-4.) Pittman began this litigation on June 6, 2006 (Doc. # 1), later added a third count of retaliation after her second EEOC charge, and filed her Second Amended Complaint (Doc. # 25) on August 31, 2007. The remaining defendant filed his Motion to Dismiss Second Amended Complaint on September 17, 2007. (Doc. # 26.)

## II. JURISDICTION AND VENUE

Because this case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations supporting both.

## III. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1965 (2007). Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the

speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1964-65 (citations omitted); *see also Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (stating that the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff). The court does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974.

## IV.  DISCUSSION

*A.     Count I - Gender Discrimination*

To establish a prima facie case of gender discrimination under Title VII through circumstantial evidence, a plaintiff must prove that "(1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). The defendant does not contest that, as a woman, the plaintiff is a member of a protected class or that she was qualified to do the job.[4] In Count I, the plaintiff alleges she was subjected to an order to report to training that was not required of two similarly situated male correctional officers. (Second Am. Compl. ¶ 26.) She also claims the training order is an adverse employment

---

[4] While the defendant only contests the adverse employment action prong in the section of his brief dealing with Count I, he does contest the sufficiency of the comparators while arguing the plaintiff lacked a good faith belief of unlawful discrimination as to Count II later in his brief. (*See* Doc. # 27.) The court will construe this argument as the defendant's position in regard to Count I as well.

action. These contentions will be addressed below.

### 1.   <u>Similarly Situated Males</u>

The employees outside of a plaintiff's protected class who are identified as comparators "must be similarly situated 'in all relevant respects.'" *Wilson*, 376 F.3d at 1091 (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1992)). Courts "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

In the plaintiff's first encounter, after an inmate "verbally abused her and threw urine on her," the plaintiff "sprayed the inmate with mace, opened the cell door where the inmate was confined, and ordered him out of the cell." (Second Am. Compl. ¶ 15.) In the second encounter, "the same inmate again verbally abused Ms. Pittman." (*Id.* ¶ 17.) The first male comparator identified by the plaintiff "had a confrontation with an inmate in the open bay area of the county jail and sprayed mace in the area, which was in violation of the policy regarding confrontation with inmates." (*Id.* ¶ 19.) The second male comparator "had a verbal confrontation with an inmate who threw liquid on him." (*Id.* ¶ 20.) Neither male correctional officer was required to submit to training.

The defendant's argument hinges primarily on construing the plaintiff as being involved in two improper encounters in the span of about one month, and by the defendant's own admission, "[t]his was the reason for the order to attend training." (Doc. # 27 at 8.)

While it is clear from the complaint that Pittman's first encounter was deemed improper by the Sheriff's Department (Second Am. Compl. ¶ 18), the same cannot be said for her second encounter. With regard to it, the complaint merely states that about a month later "the same inmate again verbally abused Ms. Pittman." (*Id.* ¶ 17.) Because there is nothing in the complaint that indicates whether the plaintiff acted appropriately or inappropriately during the second incident, the court declines to consider it as inappropriate conduct for the purposes of comparison, especially considering the allegations must be construed in a light most favorable to the plaintiff. Therefore, the court concludes the male comparators are nearly identical with respect to the quantity of the misconduct.

With regard to the quality of the misconduct, however, there is a difference between the plaintiff and her male comparators that prevents them from being nearly identical. The plaintiff and the first comparator both used mace on an inmate. If that were all the information before the court concerning that incident, it would be difficult to not label the quality of their misconduct as nearly identical. However, the plaintiff did not just spray the inmate with mace; she also opened the cell door and ordered him out of the cell. Spraying a confined prisoner with mace and then removing him from a secure location is not similar to the application of mace against an inmate who is already at large in the open bay area of the prison. In fact, the plaintiff herself notes that it was due to "improperly opening the cell door where the inmate was incarcerated" which led to her being ordered to report to training in the first place. (*Id.* ¶ 18.) The second comparator is even less similar. While he did have

7

a liquid thrown at him, he only engaged in a verbal confrontation, and there is no indication that he used mace or removed a prisoner from his cell. (*Id.* ¶ 20.) Thus, because the plaintiff has failed to allege similarly situated employees outside her classification who were treated more favorably, she cannot establish a prima facie case of gender discrimination even assuming her allegations to be true.[5]

### 2. Adverse Employment Action

Under a Title VII analysis, "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). The "action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).

The only adverse employment action that the plaintiff complains of in Count I is that

---

[5] In the court's previous order, Pittman was told that she should "plead the matter more precisely" with regard to similarly situated males. (Doc. # 24 at 8 n.3.) In her Amended Complaint, she only asserts that "male correctional officers had not been disciplined for more serious infractions." (Am. Compl. ¶ 19.) In her Second Amended Complaint, she takes the court's advice and alleges new factual information about the comparators with greater precision. However, the new information actually contradicts her first assertion that the males committed more serious infractions because now it is clear that neither opened a cell door and one did not use mace. Therefore, her alleged factual statement about the male comparators, which was earlier deemed sufficient at the court's discretion, is no longer sufficient in light of the additional allegations indicating the initial statement was inaccurate.

she was required "to take training." (Second Am. Compl. ¶ 26.) In her response brief, the plaintiff conclusively argues, without providing legal support, that "[i]t cannot be reasonable [sic] disputed that a notation in plaintiff's personnel file would adversely affect her future opportunity for advancement and increased compensation." (Pl. Resp. Br. at 3.) However, criticism of an employee or a negative performance evaluation does not constitute an adverse employment action unless it leads "to a more tangible form of adverse action." *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006). The plaintiff does not allege that the order to attend training caused her to lose any benefits or pay. The plaintiff does not claim that the order to attend training led to a more tangible form of adverse action, despite the court's invitation to do so.[6] The order to attend training was merely a type of reprimand for the violation of a departmental policy—a reprimand which does not rise to the level of an adverse employment action in and of itself. *Davis*, 245 F.3d at 1240 (finding that two negative job performance memoranda do not constitute an adverse employment action).

---

[6] In a previous order on a motion to dismiss, the court warned that "[t]he training Pittman was required to attend is not in itself an adverse employment action and the training itself did not lead to Pittman's termination." (Doc. # 24 at 7.) However, because termination is unquestionably an adverse employment action, the court elected not to penalize Pittman for failing to specify that the adverse employment action was her termination and allowed her to more clearly plead the matter in her second amended complaint. (*Id.*) Despite the court's express warning, Pittman stubbornly chooses to cling to the argument that the order requiring training is itself an adverse employment action, not only in her second amended complaint but also in her response brief. (*See* Pl. Resp. Br. at 3.) Although it is tempting to construe the plaintiff's complaint in a liberal fashion, such as that normally given to *pro se* litigants, it was not drafted *pro se* and licensed attorneys are not entitled to such allowances. *See United States v. Wingo*, No. 05-0132, 2007 WL 2409813, at *5 (S.D. Ala. Aug. 22, 2007) (declining to subject an attorney-drafted motion to the liberal construction allowed *pro se* litigants).

Thus, because the plaintiff fails to allege that she was subjected to an adverse employment action and fails to allege similarly situated employees outside her classification who were treated more favorably, the defendant's motion to dismiss Pittman's gender discrimination claim is due to be granted.

### B.    *Count II - Retaliation (Termination)*

In order to prevail on a claim of retaliation under Title VII, a "plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998) (internal quotation marks omitted)).  The Supreme Court has recently clarified the definition of retaliatory employment action prohibited by Title VII, requiring that it be "materially adverse" to a reasonable employee, *i.e.*, employers' actions "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, __ U.S. __, 126 S. Ct. 2405, 2409 (2006).  In Count II, the plaintiff alleges she was terminated thirty-eight days after delivering a letter protesting discriminatory treatment.  (Second Am. Compl. ¶ 30.)  Termination is without a doubt a materially adverse employment action capable of dissuading a reasonable worker from making a charge of discrimination and is not contested by the defendant.

In order to establish a causal connection, a plaintiff "need only show 'that the

protected activity and the adverse action are not completely unrelated.'" *Wideman*, 141 F.3d at 1457 (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). A plaintiff satisfies this element if she shows her employer knew of the protected activity and there was a close temporal proximity between this awareness and the adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Wideman*, 141 F.3d at 1457. Although it is unclear to whom the letter was addressed, when construed in a light most favorable to the plaintiff, the court assumes it was sent to and received by the defendant or his agents, thereby making him aware of the protected conduct. When establishing temporal proximity, the Eleventh Circuit has held that one month between the awareness and the adverse action is not too protracted. *See Wideman*, 141 F.3d at 1457. Because the causal relation element is not challenged by the defendant in Count II, and since the time between the letter and the termination was only slightly over a month (thirty-eight days), the court finds that the plaintiff has sufficiently alleged facts to establish a causal connection as an element of a prima facie case of retaliation.

The defendant challenges the first element of a claim of retaliation—whether Pittman was engaged in statutorily protected expression. The challenge is not that writing a letter complaining of discrimination is unprotected in and of itself,[7] but rather that the letter at issue

---

[7] Although the letter did not involve the EEOC, it is still protected activity if made in good faith because "Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'" *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (quoting *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam)).

was not written in good faith. In order to establish that the activity was statutorily protected under the opposition clause,[8] the plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Tech.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311-12 (11th Cir. 2002). Furthermore, the "plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960. "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Clover*, 176 F.3d at 1351. The employer's practice does not have to actually be unlawfully discriminatory; it only "must be close enough to support an objectively reasonable belief that it is." *Id.*

The defendant does not question whether Pittman subjectively believed that she was subject to unlawful employment practices, and neither does the court. Rather, the defendant argues that Pittman did not have an objectively reasonable belief that the treatment her letter protested against (*i.e.*, requiring her to attend training while not requiring similarly situated

---

[8] Title VII recognizes two forms of conduct statutorily protected from retaliation. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). First, under the opposition clause, an employee is protected from discrimination if "he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Second, under the participation clause, an employee is also protected if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* Because there was no investigation, proceeding, or hearing in which she participated at the time of the letter, the participation clause is inapplicable to Pittman's letter writing.

males to do so) was a discriminatory employment practice. For the same reasons Pittman's first count was dismissed, it was not objectively reasonable for Pittman to believe the order requiring her to report to training was discriminatory based on her gender.

First, the requirement to attend training was at most a type of reprimand for opening a prison cell door against jail policy. A mere reprimand, in and of itself, that does not affect the terms, conditions, or privileges of the employee's job in a real and demonstrable way is not prohibited because "Congress simply did not intend for Title VII to be implicated where so comparatively little is at stake." *Davis*, 245 F.3d at 1240.

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee. Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely—without more—establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause.

*Id.* at 1242. Importantly, Pittman's complaint fails to allege that the training was a reprimand or that it otherwise negatively impacted her employment record. Even assuming it to be so, this type of reprimand, which does not cause a serious and material change in the terms, conditions, or privileges of employment, is not actionable under Title VII, and it is not objectively reasonable to think otherwise. *See Brown*, 440 F.3d at 1265 (finding a lower score on a performance evaluation by itself to not be actionable under Title VII); *Higdon*,

13

393 F.3d at 1219 (finding several oral reprimands made in front of customers to not rise to the level of adverse action); *Davis*, 245 F.3d 1246 (finding a "loss of prestige and potential future opportunities associated with two negative job performance memoranda and the denial on two brief occasions of a favorable work assignment . . . do not meet the threshold set by Congress").

Second, Pittman can identify no suitable comparators outside of her protected class who are nearly identical and were treated more favorably. The second male comparator is completely different from Pittman because he did not use mace and did not open a cell door. Therefore, his use as a comparator in support of a discrimination claim is unreasonable. Pittman's misconduct is distinguished in quality from the first male comparator because, even though both used mace, she actually released a secure prisoner from his cell during an altercation with him, thereby greatly increasing the danger of the situation. This is admitted to be the reason she was sent to training (Second Am. Compl. ¶ 18) and is sufficiently more serious in nature than the conduct exhibited by her first comparator to have warranted different treatment, such as the extra training. The court will not second-guess an employer's decision to reprimand an employee who committed a more serious infraction than another, especially when that decision is made in the dangerous environment of a prison and very well may have been made for the employee's own benefit.

Because the law is clear that a mere reprimand is not enough to constitute an adverse employment action, and there are no alleged comparably situated males who were treated

14

more favorably, it was not objectively reasonable for Pittman to believe the order to attend training was an unlawful discriminatory action. Therefore, Pittman fails to satisfy the good faith requirement that she was engaged in a statutorily protected expression, and the defendant's motion to dismiss her Count II retaliation claim is due to be granted.

### C.     *Count III - Retaliation (Constructive Discharge)*

As stated above, in order to establish a prima facie case of retaliation under Title VII, the "plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Cotton*, 434 F.3d at 1233 (quoting *Wideman*, 141 F.3d at 1454 (internal quotation marks omitted)). Pittman's statutorily protected expression in Count III was the filing of her first EEOC charge (Second Am. Compl. ¶ 44), which easily satisfies the first prong necessary to establish a prima facie case of retaliation, *Casanova v. Pre Solutions, Inc.*, 228 Fed. Appx. 837, 842 n.11 (11th Cir. 2007), and is not contested by the defendant. In Count III, Pittman does not allege she was directly terminated, as in Count II. Rather, she alleges that the defendant constructively discharged her through the creation of a retaliatory hostile work environment that led to her resignation upon the advice of her psychologist, thereby constituting an adverse employment action. (Second Am. Compl. ¶ 42.) The defendant contests constructive discharge and the causal relation.

#### 1.     **Causally Related**

The causal relation requirement is construed so broadly that "[a] 'close temporal

15

proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon*, 393 F.3d at 1220. The defendant argues there is a lack of temporal proximity because by their calculation, four months had elapsed between the filing of the EEOC charge and the alleged instances of January 2006. However, the defendants begin their measurement from the time the EEOC charge was first filed on September 29, 2005. Had Pittman been employed with the department from that date until the seven instances in January 2007 without incident, the court would tend to agree that the temporal proximity would be too tenuous. *Id.* at 1221 (finding a three month gap too protracted). However, it is disingenuous to credit the time Pittman did not work because of her termination to a calculation of temporal proximity since she would have had little to no contact with her employer during that time, and her employer, were it motivated by discriminatory animus, would have no reason to retaliate. It is more telling that upon her forced reinstatement by the personnel board on January 3, 2006, and the first opportunity for her employer to possibly retaliate, the alleged series of harassing incidents began within sixteen days. *See Wideman*, 141 F.3d at 1457 (finding one month not too protracted). Therefore, in her complaint Pittman has established temporal proximity between her protected activity and the alleged adverse employment action sufficient to indicate they are not wholly unrelated.

    2.    **<u>Constructive Discharge</u>**

The doctrine of constructive discharge is recognized under Title VII, and under it, "an

employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation omitted). Thus, the test is objective and does not concern an employee's subjective reaction to the working conditions. *Walton v. Johnson & Johnson Servs. Inc.*, 347 F.3d 1272, 1282 (11th Cir. 2003). The threshold for establishing constructive discharge is "quite high" and requires "pervasive conduct by [the] employer[]." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).

At the most, Pittman claims seven instances that led to the creation of unendurable working conditions: (1) she was accused of harassing a fellow officer (Second Am. Compl. ¶ 33); (2) she was questioned about a conversation regarding non-work issues (*Id.* ¶ 35); (3) a supervisor threatened an officer with discipline if he did not make a statement of harassment against Pittman (*Id.* ¶ 36-37); (4) her supervisor did not show up on time for a meeting with her[9] (*Id.* ¶ 38); (5) her supervisor verbally harassed her about her conduct (*Id.* ¶ 39); (6) her supervisor issued a letter warning her not to participate in any non-work activities while on the job (*Id.* ¶ 39); and (7) she was unable to meet with the defendant

---

[9] It is unclear how long Pittman waited for her supervisor to appear. She was "ordered . . . to report to his office hours *between* 0430 and 0600 hours." (Second Am. Compl. ¶ 38 (emphasis added).) Pittman simply notes that when she reported at 0430 hours, he was not in his office. (*Id.*) The order itself is ambiguous at best as to whether she was required to arrive exactly at 0430 hours.

despite her request because he claimed he did not have time.  (*Id.* ¶ 40.)

These instances all took place in the short period of time between her reinstatement on January 3, 2006, and her resignation in February 2006.  Most of the instances are so trivial they simply cannot be considered as a contribution to any purported creation of an intolerable workplace.  For example, two of the seven instances stem only from missed meetings.  As for the first meeting, the plaintiff does not allege that she was forced to wait at her supervisor's office for an unnecessarily long period of time, and she admits to being able to contact him later that day.  Regarding the second attempted meeting, Pittman offers no allegations or suggestions as to how the defendant's inability or unwillingness to meet with her, one of over two hundred employees in the Sheriff's Department, made work intolerable for her.  At most, these two instances amount to inconvenience.  *Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002) ("[D]ifficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." (quoting *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001)) (internal quotation marks omitted)).

At best, two other instances amount to no more than "a feeling of being unfairly criticized," which is also insufficient to compel a reasonable person to resign.  *Id.*  These instances are the questioning Pittman received concerning a conversation she had with another officer and a letter that appears to follow up on the matter.  Pittman admits that the conversation she had  while she was at work was about a non-work matter since she told her

supervisor afterwards that "she would only in the future communicate with [the other officer] about work-related issues." (Second Am. Compl. ¶ 35.) The letter only reinforced the outcome of her supervisor's questioning because it warned her "not to participate in any activities on the job unless the activities were job related." (*Id.* ¶ 39.) While these two instances actually amount to fair criticism, at most they could only give a reasonable employee the feeling of being unfairly criticized. These two episodes are not objectively intolerable.

Of the three remaining incidents, one of them involves allegations that her supervisor verbally harassed her, although this too appears to be just another criticism of her non-work-related conversation while on the job because it took place at the same time the letter was given to her. (*See id.* ¶ 35.) Another incident alleges she was accused of harassing the officer with whom she discussed non-work-related issues while on the job. Pittman does not say who made the accusation, does not allege it was a formal accusation, does not allege that it was unfounded, and does not allege how this made her employment intolerable. Once again, this is another case of feeling unfairly criticized, which does not meet the high threshold for establishing constructive discharge. *Williams*, 218 F. Supp. 2d at 1299. Finally, the last instance alleges that another employee was strong-armed into making a statement against her for the purpose of harassment. Even assuming this to be true, Pittman does not allege that the statement was actually made by the employee or that her supervisor carried out the threat. Considering these three remaining instances together, they fail to

constitute the type of *pervasive* conduct that is required to allege a *prima facie* case of constructive discharge. *See Hipp*, 252 F.3d at 1231 (listing examples of pervasive conduct).

Assuming the allegations to be true and construed in a light most favorable to her, Pittman has failed to adequately allege facts that, if true, could plausibly support a claim of retaliation through an adverse employment action of constructive discharge. Therefore, she cannot satisfy the requirement of an adverse employment action and the defendant's motion to dismiss Count III is due to be granted.

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that:

1. The defendant's Motion to Dismiss Second Amended Complaint (Doc. # 26) is GRANTED as to Counts I, II, and III;

2. Count I of Pittman's gender discrimination claim is DISMISSED;

3. Count II of Pittman's retaliation claim is DISMISSED;

4. Count III of Pittman's retaliation claim is DISMISSED.

An appropriate judgment will be entered.

DONE this 18th day of October, 2007.

                                      /s/  W. Keith Watkins
                                UNITED STATES DISTRICT JUDGE